The Rush-Copley Medical Center, Inc. with Pat Heller, Defendant's Affiliate. Hardly on behalf of the Defendant's Affiliate, Mr. Todd Heller. Hardly on behalf of the Defendant's Affiliate, Mr. Mark A. Sansoni. All right, thank you. Mr. Heller, on behalf of the Appellant, you may proceed. Good morning, and may it please the Court. My name is Todd Heller, and I am here on behalf of the Appellant, Norma Lovell. We are here because we are propounding that this Court should reverse the summary judgment that was entered on this case on the basis that, as a matter of law, Rush's disclosure of the Physician Employment Status Form was not confusing, misleading, unclear, or ambiguous in any way. We feel as though it was confusing, misleading, unclear, and ambiguous, and it did not, therefore, adequately inform the Plaintiff of Dr., and I can't pronounce his last name, so I'm just going to call him Dr. D., if that's okay with you, Dr. D.'s independent contractor status, and that, therefore, there is arguable conduct by Rush in this case that could lead a reasonable patient in these situations to believe that Dr. D. was an employee. But his name's not on the list. I mean, there's a whole list of employed physicians. So these are physicians employed by Copley. Your client turned the initial, the bottom of that, and Dr. D. is not on that list. He's not on the list, but also he's not, urology is not mentioned on the other consent form. So it is confusing, I agree, but there's 60 doctors listed. And that goes to the second point, and that is that we also feel that, or are also contending that as a matter of law, the Plaintiff's alertness and confusion to read and comprehend Rush's disclosure of Physician Employment Status Form is a question of fact as to the holding out element of the Plaintiff's cause of action. So you would take the position it's not dispositive. The mental state of the claimant or the Plaintiff is a factor to be considered. Correct. It's not dispositive. Correct. And, therefore, it would go to, you know, the final panel. The tribal issue. Yeah, it would go to the jury. Assuming this form is not ambiguous, it is clear as a bell, let's assume this form was just one line that said, Dr. D. is not an employee of this hospital and the client signed it, would her mental state be an issue still? Yes, I think so. I think so. And let me give you my thoughts and my reason is on this, and that is, you know, there's lots of cases on this. You know, since 1993 with Gilbert. And, you know, we look at it as, is Gilbert clear? Don't mind me having all this case law on point. So it's clear, but it's also somewhat confusing because what really did Gilbert do? And I look at Gilbert, and really Gilbert is a, when you look at Gilbert, it's got public policy dictates to it, and that's the reason for the Gilbert decision. They look at it and say, you know, and I can quote, but they're talking about the reality of the business in the modern hospital world, which has even gotten more of the way they've described it. And I'm quoting now from Gilbert when they're quoting the Wisconsin Supreme Court, hospitals increasingly hold themselves out to the public. Inexpensive advertising came as offering and rendering quality health services. It goes on, modern hospitals have spent billions of dollars marketing themselves, nurturing the image with the consuming public that they are full care modern health facilities. I'm skipping again. In essence, hospitals have become big business competing with each other for health care dollars. Look at the facts in this case. That's what happened. Goes to Kishwaukee Hospital emergency room. Kishwaukee Hospital, in essence, can't handle the situation. Decide they need the experts, urologists. Excuse me. They go to, what do they do? They don't pink out or say we're going to send her to Dr. D. They say we're going to send her to Rush Hospital. Body ambulance in a very, very bad state. You all have seen the state that she was in when she went to Rush Hospital. She wasn't going there to see Dr. D. She was going there because it's Rush. It's the modern hospital that is rendering these high quality cares. And then they talk about, in the public policy dictates from the Mississippi Supreme Court, if they, emergency room physicians, do their job well, the hospital succeeds in its chosen mission, profiting financially and otherwise from the quality of emergency care so delivered. On such facts, anomaly would attend the hospital's escape from liability where the quality of care so delivered was below minimally acceptable standards. That's what we're taught. She went to Rush. She went to Rush because that's where Kishwaukee sent her. What could she do? No. I'm, I mean, realistically in the modern world, no. I'm dying. Well, I mean, you have your point as intuitive appeal. We know that a patient in extremis or in a bad mental or physical state is realistically going to be inclined to go with the flow. But then the other part of the analysis is public policy. What is a hospital supposed to do if the person is not understaffed? How do they inform the plaintiff except by way of a form? That's the purpose of the form. Otherwise, there'd always be a tribal issue. There'd be no point. They'd always be holding out. How else can they convey to the patient other than in a written document? And I think that is really what Gilbert is looking at is, is there a reasonable expectation? Does she comprehend that? Well, let me ask you a point of question. Do the first two factors in Gilbert say anything about a patient's intellectual or physical condition? Or do they speak to what actions of the hospital would it convey to a person? I don't think, the first two factors in Gilbert don't talk about the patient's mental or physical state, do they? Specifically? I don't think they specifically, yeah, I don't think they specifically mention it. But I think it's implicit that if you're giving consent, that there's got to be a capability of giving consent. And so what they're doing, the holding out is the consent. I mean, that's really what you, and how can you give, how can you give consent? Is it the case law that says that a hospital must ensure understanding? No, and I think that, and you've seen, I mean, that's, I admit, okay, that's what a lot of the argument has been. I do, yes, I'm sorry, I think that Singelman, which went to the, yeah, which went to the, which went to verdict on the issue, I think that that does state that. They had the dual, they found that the form was confusing, and there was some element of confusion. You got it, yeah. But, so, I mean, that's why I asked you before, if the form wasn't confusing, you know, is Spiegelman still good law? You know, or is that just an added fact that Spiegelman, again, that went to, went to verdict? How's this, okay? And I don't know if that is the, if that's, yeah, but in my opinion, yes, I think that, you know, that's what it should be. I mean, I'm being candid. And I think that when I'm saying that, it is really the rationale behind, behind Gilbert, and that is, you know, let me, let me, Lamb versus Rosenfeld. First, the case law discussing the holding out element under Gilbert clearly does not require that the hospital ensure actual notice to defeat an apparent agency claim. Our court has stated that the focus of the holding out element is whether or not the patient knows, or should have known, that the physician is an independent contractor. So if you look at that as, as the public policy analysis that caused the court, the Supreme Court, to write Gilbert, to create Gilbert as law, the, and the holding out element is whether or not the patient knows, or should have known, that the physician is an independent contractor. You're saying, and the equation knows, you're saying it's inextricably tied up with the mental condition of the patient as to whether or not they would know, or be capable of knowing. Any emergent situation, the chaotic situation, I think, is the way Gilbert's position is. Although isn't it the situation in most cases when they end up at a second hospital? You're using an extremist, aren't you? Yes, yes. I mean, you're, you're, you're, you're, yes, so, so. The hospital's going to say, well, how do we ever, you know, protect ourselves if we automatically assume that a person's going to be, you know, in a bad physical state when they get there? What is the hospital supposed to do? Realistically, maybe there's nothing they can do in this situation. And maybe that's the rationale behind Gilbert. If you look at, look at York, okay, which is the really the only other Supreme Court case that, that discusses Gilbert. It's all, all the rest of it. Excuse me. Wouldn't that be just completely unfair to hospitals to put this requirement on them to make, making sure or having some sort of additional evidence that a person has a rational understanding of the forms they're signing? No. I mean, I'm being, okay. No, it's, it's the hospital. They're providing the care that my, my, my client, independent, independent contractor, the doctor's providing the care. The hospital is just a site where the care is being provided. No, they're, they're, they're, they're licensed. I mean, they're, they're, they're, they're credentialed. They're bringing them in. So, no, I don't think it is. The hospital, the hospital treats the patient, not the doctor. It's, it's, it's the, the reason Norma Martin went to Rush is to be treated by Rush. She is not going there for Dr. D. She is going there for Rush. And Rush is bringing in urologists. You're talking about throwing out this whole current agency thing and the hospital is always liable. Well, no. And, and, and, and, and I, I am not saying that, okay, because, and that's why I think it's a factual situation. Suppose you're going in with a finger, okay, and you've got a broken finger, you know, and, and you break your finger. But all I have to do then is a plaintiff to say, you know what, I was really drunk. That's how I broke my finger, so I don't remember anything. I mean, you could get by a summary judgment pretty darn easily on this current agency thing by basically saying, I don't remember signing that form. It's a question of fact whether they remember. It's a question of fact whether, okay, or not the patient knows or shouldn't have known that the physician is involved. Well, I mean, maybe that's a mundane question, but your client wasn't unconscious when she went in there, was she? Not at that point. She was pretty bad. She was on Dilaudid and she had either venous Dilaudid and. But she was given a form and she signed it. And her signature appears in there, correct? Your Honor. Okay. Right. I mean. You're dying, okay? No, I know what you're going to say, but it is her signature on the form, correct? You're dying, of course. Yeah. You're, you're, you're, you're sick. You're, you're, okay. You're, you're in bad shape. All right? Yes. Al? You're going to say anything. I mean, we all do it. We all do it. I mean, I know it's a cracker, but yes. And that's, and yes. And that, so what I'm saying is you go in, you break your finger. You're playing softball. Okay. And you go into. Actually, it happened to me once. Yes, it happened to me too. That's why I'm using the, okay. Yeah, it happened. Okay. It happened. I mean, that's why we, okay. And I walked in there and, and I said, thank you. And I said, thank you. And I said, thank you for a question.     You can't do that. So, I think I jammed my finger, and I needed an x-ray, and they say to me, okay, here, sign your consent. You know, I'm the radiologist and the, is not. Okay? And I, okay sure, no problem. Okay. I sign it. Question of fact, I go to a jury. You're, you know, I'm, you know, did you, yeah, I knew I signed it. Okay? Same thing. I go, I, and he goes, you're dying, okay? Kishwaukee takes you to, to, to, to, to, to copy, you're on Guy Lawdon, you've gone by ambulance, you do think you're dying, right? And so, so the question then is, the focus of the holding out element is whether or not the patient knows or should have known that the physician is a, is an independent contractor. And I think that that, that the should have known part is the part that the cases sees on whether they were put on notice. You know, known, no, we all know what known is. You knew it. Well, okay, she's testifying she didn't know it, but should have known, and then the cases bring that a step further and say, well, she put on notice. Yeah. And that's, and I think that that's a question of fact. No, I, I, so, so I'm not saying that a jury, you know, I mean, you could, you could get my, my, my argument in front of a jury would, would be, you know, in some ways similar to this and added what my argument was in the, in the lower court, you know, this should be for, for a jury, we should, we should argue whether she knew or should have known at that point, you know, and, and, you know, if, if, if she was, what if the record said she was not alert, you know, and not oriented down, you know, she said, I don't remember anything. It does. She did go by ambulance. She was on the line. Yeah. Can I ask the question? What is the, you know, the nurse, what is the effect of the dialogue? Can it make somebody not oriented and not alert? Yes. So, so I think that's, that's the question. I do think, again, from York, at, at York, at page one, at 222, Illinois second, 192, where, where they talked about the rationale, the underpinning in its holding in Gilbert, right? In Gilbert, this court recognized that the relationship between a patient and healthcare providers, both physicians and hospitals, represents a matrix of unique interactions that finds no ready parallel to other relationships. To underscore this point, we set in a great deal of what we termed the realities of modern hospital care and concluded that the fervor and competition between hospitals to attract patients, combined with the reasonable expectation of the public that the care providers they encounter in a hospital are also hospital employees, raise serious public policy issues with respect to a hospital's liability for the negligent actions of an independent contractor physician. Mr. Helley, your time has expired. I'm going to direct. You'll have time with the rest of the court and everybody. Okay. Thank you. Thank you very much. I'm sorry if I didn't hear. No problem. All right, Mr. Sansoni, you may proceed. Thank you, Mr. Court. Counsel. My name is Mark Sansoni. I have the privilege of representing Rush Copley Medical Center in this matter. I know you're familiar with the facts. We have a situation here where Ms. Martin was transferred to Rush Copley by ambulance on June 20, 2014. She arrived at Rush Copley at 8.57 p.m. and was admitted as a patient of Dr. Divakaruni, a urologist. At 9.10 p.m., just 13 minutes after she arrived, she signed an initial form entitled Disclosure of Physician Employment Status. She signed that form before any other consents at Rush Copley and before she received treatment at Rush Copley. She testified in her deposition she had no recollection of that, correct? Correct. She has no recollection of the events. I think she said for several days thereafter as well. I mean, he has a certain logical appeal to his argument. Many people coming into a hospital under those circumstances are not in good physical or mental shape. I think we have to acknowledge that. That's in many cases the situation. So does that bear on the issue of a valid acknowledgment? Well, except for the fact that when you go to a hospital, you sign consents. And if you're unable to sign a consent form, they sometimes have to have a different representative sign the consent on your behalf. That's not the situation here. She was clearly alert and oriented. It's in the medical chart that she was. She was able to provide a history of her medical conditions. She was able to tell the doctor how she was feeling, what was going on. And all of that was done right around the time that she signed this form. So there may be situations, and I think this court held in Turkey, that there could be times where you could have someone's mental capacity being affected. But this isn't one of those situations because there's no facts that have been presented by Ms. Martin or by the record that she was not able to appreciate what she was signing at the time. And the hospital has to be able to rely on these forms to be able to notify patients of the employment status of their physicians. Otherwise, like your Honor said, every time you would have a parent agency, right? So what they did was they went a step further than most of the cases that have been up on appeal, where you're dealing with consents, multi-part consents, release of valuables or responsibility for that, HIPAA, privacy notices, all contained in the same consent. Rush Copley created a separate document here that specifically is to inform patients whether or not their physicians are employed by the hospital. If he's not listed underneath the form, he's not employed by the hospital. Correct. And she signed and acknowledged that portion here where it says, I understand that if my agent or employer, Rush Copley Medical Center, Rush Copley Medical Group, NFP, or Copley Memorial Hospital, E. She'd write it. It says, you know, I've read this entire form. I acknowledge this. I had the opportunity or any questions I had about this form and important information contained there and have been answered to my satisfaction. If she said, you know what? I'm really loopy on medication. I can't read this. I can't understand it. She could have brought that to their attention and somebody could have explained it in more detail. Maybe they would have needed someone else signing on her behalf. How many people do you think actually read these forms? Especially someone who thinks they're dying. No, I agree with you. I would say the majority of people do not read the forms. They don't even look at it. They just want the treatment. They signed the document. Right. Probably a good idea to video record. And maybe we're going to get to a point where that will be a possibility. But when you're dealing with patients like this and it's emergency situations, you have to provide treatment. You don't want to wait and go through a longer process here. You want to get these people treated right away. And Ms. Martin was treated right away. She was given this form to sign. And I think it was ten minutes later, Dr. DiPiccironi was in the room and he was evaluating her. As long as we're talking about the implications of some of these statutory scenarios, what would happen? Mr. Heller says she wanted to be treated by somebody who was on staff at Rush Capital. So what happens if she just looks at the form and says, I want somebody who's on staff here? What happens then? Well, I mean, I think the reason the forms were in the way it is and the other consents for anesthesia, say all anesthesiologists are not employed by Rush Capital. There are urologists who are employed by Rush Capital. It's not a complete across the board. It's not the only one that's there either. Correct. So somebody else could theoretically step in if the patient objects? I don't know if at 10 o'clock at night that is the situation, but if it's probably going to deal for the patient, yeah, they can discuss it. Depending on the condition. Right. Or maybe she needs to be transferred to a different hospital if she really wants some other position to be her urologist for this treatment. You mentioned that Jonathan, the fact that she was a little oriented and all that. I mean, to what extent can we rely on that in the face of the arguably contradictory evidence that she doesn't remember in her deposition anything about it and then in her affidavit she says she was confused on her early admission or something to that effect? Right. So the reason, my understanding is the reason for her not recalling these events is because she did end up in a coma. She did. She was unconscious for a period of time later in the following day. And because of that, because of the situation that she underwent and the medical, basically trauma that was involved here, she doesn't have a recollection of all of these events. That happens, right? But at the time when she signed this, when she first presented there, that wasn't what was taking place. But how do we know that? I mean, how do we know that it's because of the later coma that she doesn't remember what happened when she signed the form or simply that she was on Dilaudid, she was in extreme pain, that she literally was in a blackout situation at that time? If that was the case, then why would the medical record and C-427 contain Dr. Dibikaruni's entire history that he got from the patient here? Where she tells him all about her, in further discussion with the patient in regards to her history, she notes she had a stone previously in 2003. She also had questionable left-sided UPJ obstruction at that time. I mean, she provided all this information to him. If she's not able to be of sound mind, how can she provide that information? There's no indication that information was false or mistaken? No, there's no information. And again, under the physical examination, alert and oriented times three. So if a patient says they know where they are, they know what date it is, they know who the president is, they test them to see their mental capacity to be able to put down the chart, alert and oriented times three. And that was Ms. Martin. So for her to say, well, I was confused, but I don't remember any of those events, it's really a contradiction. And I think the trial court didn't consider the affidavit because of that. Because she said under oath in her deposition, I don't recall these events. So how can she now in an affidavit in opposition to a motion for summary judgment oppose that? It's forbidden. So she didn't have a recollection of these events that took place. We have medical records that show what was going on at the time. We show that she was of sound mind, or at least alert and oriented and able to provide this history. So it's not a situation like the one in Spiegelman that counsel was talking about where there was vision issues and the patient was dizzy and you had a multi-part consent form that was the issue there with small prints about the doctor's employment status and the signature line over the section that says we're not responsible for lost valuables. This is at Spiegelman as I recall. It's a factor. I mean, they noted that, but they didn't say they didn't hold the debt in and of itself was dispositive of the holding out issue, correct? Correct. I mean, they said both were factors in that. I think this case is more akin to Steele, which is the case that involved the daughter who was in pain when she signed the consent. And the facts there were that she was conscious. She was able to sign the consent. There was no evidence that she was unconscious in the ambulance, just like Ms. Martin. Although she was in pain, she was able to discuss her symptoms and her medical history. And there was no evidence that she was unable to understand the form that she signed or assent to its terms. That's the same situation we have here. There's no evidence presented that Ms. Martin was mentally incapacitated, that she didn't have the wherewithal to be able to sign these documents. There's no indication that she was unconscious at any time before she signed these documents. She was able to discuss her symptoms, her medical history, and provided all that to Dr. Bibikaruni. Under mine said, one who signs a document is charged with knowledge of its contents. She signed this document. She should be charged with knowledge of it. And again, the hospital, what more could they possibly do to try to notify patients of the employment status of their physicians when some are independent contractors other than by these type of forms? And like I said, they went a step farther than most of these other cases where they created a separate document to let people know that, not in some confusing multi-consent form. In the Gilbert analysis, the hospital prevails in the holding out element if the patient is in some manner put on notice of the independent status of the physician. Well, we have that here. We have that with this document. Brush Copley also, on their website, disclaimed that Dr. Bibikaruni had any employment relationship there. They mentioned on their website that he's an independent contractor. So they took an additional step trying to notify the public as to who is employed and who is not employed there. There was no other proof of conduct on the part of the hospital in this case that could lead a reasonable person to believe that Dr. Bibikaruni was an employee. Planet only argues that, well, Dr. Bibikaruni accepted her, he treated her, took her to the emergency room, to the operating room, and he discharged her. Well, that's all well and good, but there's no case law that he cited of any authority that says those actions equal holding out a doctor as an employee. In fact, the Malinowski case actually holds otherwise, that just supplying equipment and is not evidence of an employer-employee relationship. So what we have here is evidence in this case that the hospital took steps to put this patient on notice. She signed the form. She initialed it, indicating that she understood what she was signing and that she verified that Dr. Bibikaruni was not an employee of the hospital. The form itself is clear and convincing. There's no other evidence provided that she was incompetent or unable to understand this form. She signed it and initialed it and didn't ask to have it explained. So our contention is that the trial court correctly entered summary judgment in this matter on behalf of Rush Copley. The only other form that mentions Dr. B is the consent for surgical procedure, and that doesn't say anything about his status as an independent contractor, correct? Right. And the reason there's different consents there is because some of them, like the anesthesiology one, all of those physicians are not employed. It's a different group, and none of them are employees of the hospital. But the hospital uses the form like the one that mentions Dr. Bibikaruni because some are employed and some are not employed. Urologists, right? So they provide the disclosure of physician employment status form first to allow everyone to know these are the doctors who are employed if they're not listed there as an independent contractor. But that form does have the Rush Copley logo on the top of it. It does. Yes. Based upon all of the factors under Gilbert, this case was rightfully decided that summary judgment was proper. There's no question of fact on this matter, and we ask that this court affirm the trial court's decision. All right. Thank you, Mr. Gensel. Thank you. Mr. Hellery may close the court any moment. I'm sitting there thinking, hearing your questions and my thoughts, and I think we have to go back to Gilbert and say, what is the purpose of Gilbert? What is the rationale behind Gilbert? The rationale behind Gilbert is to protect patients, not to protect hospitals. That's when you read Gilbert and you read the underpinnings and the reason that they came out with this, if they're holding out, it's an apparent agency, is to protect patients. And the classic patient that Gilbert wants to protect is somebody like Norma Martin. Norma Martin, as far, think about the concept of holding out. She's going to rush Copley Hospital. She is not going to rush Copley Hospital to see Dr. D. She is going to rush Copley Hospital because they are holding themselves out as somebody who can provide urological care to her that she needs. When she gets there, it just happens to be Dr. D. She thinks she's dying, or I shouldn't even, she's in bad shape. She's on Dilaudid. She's taking an ambulance there. She's in terrible pain. She is, that's what she cares about. A couple comments on that form. It is in itself unclear and confusing. There's 60 doctors listed there. Justice Burke, you asked me, what would I have done if it was just Dr. D. And how would I feel? I think that that would move it in a spectrum to be more clear and confusing. But you really expect somebody to read 60 doctors and Dr. D., Dr. Kunad, and to see if he is listed as a doctor. No, that itself is a question of fact, whether or not listing 60 doctors comes into that. One could argue if Gilbert was really designed to protect patients and not hospitals, the court would have said that a doctor working at a hospital is holding himself or herself out as an apparent agent of that hospital simply by treating patients there. But we don't have that. No, I think that they go beyond that to say, you know, you can get around it. And what I used as a situation where you know, I mean, if I go in and it's my, and I'm signing, I know. Okay, and they say, you know, you don't have, you can go, Todd, you can leave, you can go, you know, down the block and go to a different hospital and have them x-ray it. And I sign it because it's my finger that's broken. You know, so they'll leave. They'll say, you can do that. But you're right, there may be situations where the hospital can't do it. You know, they, and I'm conscious, you can't do it. I mean, in a Dewan-induced haze that you really can't give consent. A lot of the facts, the facts are that she was a latent type 3, correct? That's their record. Her record is their record. That's the record that was before the court for summary judgment. But her affidavit was, she was confused. Her affidavit and summary judgment, she can't take both. She's stuck with her first sworn testimony. The affidavit cannot, for purposes of summary judgment, would you agree she cannot contradict her sworn testimony? I don't think she contradicted it. I think she added it. But I agree with you, she can't. She can't contradict. That's the evidence that was before the court. Understand also that in there, and this is at C-401 and C-406 and C-407, she was septic with bacteria in her blood at the time she signed the form. So we know that. And I think that oriented and alert, and that's a question of fact, whether she knew or whether she should have known, and I do think that's the protection of Gilbert. I think that Gilbert is there to protect the patient in that situation, to give apparent agency, rather than be onerous against the patient and presume that that is not there. And really, I guess that's the crux of the matter here today. So I thank you. Oh, and just one, and I don't think it matters, but just one last thing. Talking about the website, what is she supposed to do? Pull out her iPad in the emergency room and read? I mean, come on. So that's, yeah, that is not what we have in front of us. We have a chaotic, emergent situation where she's rushed to Rush Copley Hospital. Yes, we are capable of handling her. Bring her on over from Kishwaukee by ambulance. In that case, they are, there is an apparent agency. I thank you very much, gentlemen. All right, thank you, Mr. Gilbert. I'd like to thank both counsel for the quality of the arguments here this morning. A written decision will, of course, issue in this matter a due course. It will be under dive until then.